## HODGES et al. v. NORTH.

No. 18136. Opinion Filed June 26, 1928.

Rehearing Denied Dec. 18, 1928.

Chas. R. Alexander, for plaintiffs in error.
S. M. Smith and S. A. Horton, for defendant in error.

HERR, C. This is a will contest case.

Alfred North died on the 3rd day of February, 1926. He willed one-half of his real estate to his daughter, Ella O. W. Hodges, and the other half to his son, Absolem B. North. The balance of his property was willed to his five grandchildren, they being children of a deceased son, share and share alike. These children were all minors. Johnnie V. North, their mother, is also their legal guardian. Ella O. W. Hodges and Absolem B. North joined in a petition in the county court asking probate of the will. Johnnie V. North, as guardian of the minor children, contested the will. The county court denied probate. Proponents appealed to the district court, where probate was likewise denied. Proponents appeal to this court.

A *motion* has been lodged by contestant to dismiss the appeal. It appears that subsequent to the rendition of the judgment denying probate, but before the settling and signing of the case-made, Absolem North, one of the proponents, died. The action was not revived in the court below, but was revived in this court after appeal. It is now requested that this order of revivor be vacated and the appeal dismissed because this court was without jurisdiction to revive the action.

It appears that Absolem B. North, at the time of his death, was a bachelor; that his only heirs were Ella O. W. Hodges, his sister, appellant herein, and contestants, who are his nephews and nieces. These are the only parties in interest and they were all before the court prior to his death. In these circumstances, no revivor was necessary.

In the case of Donnor v. Quartermas (Ala.) 8 So. 715, it is said:

"The death of a tenant in common pending an action for partition does not necessitate the revival of the action against her administrator where her share descended to her cotenants, and where no effort was made to charge her with the rents and profits of the land."

The contest here arises principally over the disposition of the real estate, and under the above authority, it is immaterial whether or not the action was properly revived. The motion to dismiss is denied.

The contest is based on the sole ground that testator was mentally unsound and not competent to make a will. Twelve witnesses testified on behalf of contestants and an equal number on behalf of proponents. Each and every witness testifying on behalf of contestants gave as their conclusion that testator was not capable of making a will, but none of them, in our opinion, testified to

any fact which would justify such conclusion. Two witnesses, when asked on cross-examination to state the facts upon which they based their conclusion, stated that the old man frequently loaned them money and when due and payable would ask for payment and in the next day or so would tell them they might keep the money a little while longer. The witness Bradshaw based his conclusion upon the fact that the deceased appeared, on several occasions, to be troubled with a lapse of memory, and that on those occasions he would not seem to know the way home; that he had lost directions and that witness assisted him on his way home. To the same effect is the testimony of the witness Pollock. According to these witnesses, they noticed this apparent lapse of memory probably a half dozen times between the first of the year 1922 and July, 1924. The witness Harrison testified that sometime in the year of 1924, while visiting him in his home, testator commented upon a newly paved street in the city of Woodward, stated that it was a *pretty road*; asked where it lead to. Witness replied that it ran to the suburbs of the town, west; that testator then replied that someday he would get into a car and drive to the end of this road. This is the only circumstance this witness could give upon which to base his conclusion that testator was mentally incapable of making a will.

Several of the witnesses testified that occasionally testator would misplace his hat and his cane, and based their conclusion on this circumstance. Two witnesses testified that at certain times he would value his farm at $100 an acre, and at different times would value the same at $50 an acre, and on these circumstances based their conclusion.

This is a fair sample of the testimony offered by contestants.

It appears that testator, for sometime prior to his death, had made his home with a son, since deceased. The testimony of several witnesses is to the effect that testator had made repeated statements that he had given his place to this son. That he had intended so to do, we have no doubt, but we also entertain no doubt that he subsequently changed his mind, and it is also perfectly clear that he knew exactly what he was doing when he did change his mind and that he did so deliberately and intentionally.

After the death of his son, testator continued to make his home on the farm with Mrs. Johnnie V. North, widow of the deceased son, and he remained there until

within a few days prior to the time of the execution of the will in question. Mrs. North testified that after the death of her husband, testator made several indecent proposals to her, and that on the night of the 27th of April, 1924, he became so insistent that she was obliged to call in one of the neighbors for protection. Mr. and Mrs. W. B. Brawner were called on that night. The evidence discloses that this was resented by testator, and the next morning at 5:30 he left the place and came to Woodward, where he boarded and cared for himself, paying his board until shortly before his death.

Mrs. Brawner was a witness on behalf of contestant and testified that in her opinion testator was incapable of making a will, but on cross-examination stated that she based her opinion solely on the alleged indecent conduct of testator; that personally she knew nothing of such conduct and her opinion was based entirely upon what Mrs. North had told her. This witness further testified that testator resented this accusation and then and there stated that he had intended to do well by Mrs. North and her children, but because of this charge he intended to cut them off without a penny.

It appears that a prior will had been made by testator which was on deposit at the office of the county judge; that immediately after the incident above mentioned, testator went to the office of the county judge, withdrew the old will, and shortly thereafter executed the will in question.

Several of the witnesses testifying in behalf of contestant base their conclusion of incompetency on the fact that testator changed his mind as to the disposition of his property, yet most of these witnesses testify that testator gave as his reason for making the change that Mrs. North had falsely accused him and was attempting to ruin his character.

The county judge testified that sometime after the execution of the will, proponents consulted with him relative to the testator's condition and as to the advisability of placing him in the institution at Supply; that witness advised against such proceeding, and nothing was further done in regard thereto. This conversation is not remembered by proponents. Be this as it may, it is evident from the evidence offered that testator's condition at no time warranted such proceedings against him.

We are of the opinion that the evidence is wholly insufficient to warrant the finding of the trial court that testator was not mentally capable of making a will. In the recent case of Matteson et al. v. James et al., 131 Okla. 142, 268 Pac. 296, this court says:

"When the testator, in making a will, understands the nature and consequence of his acts and is free from duress, menace, fraud, and undue influence, he has testamentary capacity."

Measured by this rule, we feel no hesitancy in saying that testator had testamentary capacity at the time of the execution of the will. The testimony offered by contestants falls far short of establishing that at such time he did not understand the nature and consequence of his act. Much of the testimony offered by contestants proves quite the contrary. Especially is this true as to the evidence of the witnesses who habitually borrowed money from him. This evidence conclusively established that he had sufficient mental capacity to make these loans; that he knew the exact amount thereof; knew when they matured and was vigilant in the collection of the same.

The same may be said as to the witnesses who based their conclusion of mental incapacity upon the sudden change of mind of the testator in the disposition of his property. This testimony, instead of establishing want of capacity upon the part of the testator to make a will, proves absolutely the contrary. This evidence, not only shows that testator knew and understood the nature of his act and knew what he was doing, but also shows that he gave his reasons therefor.

The evidence that testator would occasionally misplace his cane and his hat and lose directions on his way home and other evidence of like character, has little, if any, weight. This court, in the case of McClure, Ex'r, v. Kerchner, 107 Okla. 28, 229 Pac. 589, says:

"The testator must have sufficient memory to comprehend the conditions of his property and his relations to the objects of his bounty, but the fact that the memory of an old person has failed somewhat does not of itself invalidate his will, as occasional lapses of memory, mere decay or feebleness of memory or absent mindedness, ought not to invalidate a will unless amounting under our general rule to a mental incapacity to collect the particulars essential to a just testamentary disposition."

The evidence does establish that testator was old and feeble, and that he occasionally was somewhat forgetful, but falls far short of establishing that he lacked testamentary capacity.

Two physicians, who had waited on testator and examined him during the year 1924,

testify that he had an active and acute mind, and that they considered him perfectly competent to attend to his business. Testator's bankers testified that he was competent to transact his own business, and did, in fact, continue to do so until a very short time prior to his death.

To the same effect is the testimony of counsel for testator. Numerous other witnesses likewise testify as to the competency of testator to transact his business. There was no attempt to establish undue influence on the part of anyone inducing the execution of the will.

From what has been said, it follows that the court erred in denying probate.

Judgment should be reversed, and the cause remanded, with directions to admit the will to probate.

BENNETT, LEACH, JEFFREY, and DIFFENDAFFER, Commissioners, concur.

By the Court: It is so ordered.